UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-20508-COOKE

UNITED STATES OF AMERICA,

v.

DAVID LUBIN,

       Defendant.
_____/

**MEMORANDUM OF LAW IN OPPOSITION/RESPONSE
TO UNITED STATES OF AMERICA'S MOTION FOR
<u>RULE 35 SENTENCE REDUCTION FOR DEFENDANT DAVID LUBIN</u>**

Defendant David Lubin, through and by undersigned counsel, respectfully submits this memorandum of law in support of a reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. The Government has requested a 40% reduction of David's 36-month sentence, which equates to a reduction of 14.4 months. We respectfully submit that it would be unjust if this Court ordered David, whom the Government described as a mere "link in the chain" of the conspiracy, to serve 22 months in prison in light of the following:

- His **extensive and substantial cooperation with the Government**. David quickly pled guilty pursuant to an Information, promptly met with the Government multiple times, and provided critical information that led to the arrest and/or prosecution of multiple people. David testified at trial against a more culpable co-conspirator who was convicted on nearly all counts. David also voluntarily cooperated in an obstruction of justice investigation and has agreed to cooperate in an asset forfeiture investigation.

- The **vast and unjust disparity in sentences**. The Government has argued that the scheme was orchestrated by "four principals" who were managers/supervisors of the scheme. David is not one of them. Two of the scheme's principals, however, were sentenced to only six and sixteen months' imprisonment and the latter sentence will be reduced even further pursuant to a pending Rule 35 motion. All four principals also profited substantially from the scheme whereas David was merely a "link in the chain" who earned a fraction of what the principals made. Basic fairness and proportionality dictate that David should not serve more time in prison than the scheme's most culpable participants.

- David's **time in prison has imposed extreme hardship on him and his family** because he has been unable to faithfully practice his religion, and he has been

1

incarcerated more than 1,300 miles from his family in exceptionally harsh conditions.

Accordingly, and as set forth in detail below, David asks this Court to impose a sentence of "time served" or impose a specified term of home confinement as an alternative to additional imprisonment.

## BACKGROUND

The scheme in this case defies brief explanation. At its core, the scheme involved the creation of shell companies; fraudulently registering those companies with the U.S. Securities and Exchange Commission ("SEC"); fraudulently obtaining approval for over-the-counter trading of shares of the companies in the penny stock markets; creating a secretly controlled class of free trading shares for the companies; misrepresenting or concealing who controlled significant portions of the stock; and the fraudulent sale of the companies for subsequent use in "pump and dump" schemes or other stock swindles.

David is a 54-year-old former lawyer who pled guilty to a one count Information charging him with conspiracy to sell unregistered securities. David is one of at least nine other defendants who pled guilty or was convicted by a jury. David was not one of the scheme's managers/supervisors or principals. David's profits from the scheme were also far less than the principals' profits. David's primary role in the scheme was to draft and distribute legal opinions and prepare legal documents that helped facilitate the scheme. David also created a shell company that was used in the scheme. Nonetheless, David has accepted responsibility for everything he has done illegally and is deeply remorseful for his actions.

David was, and remains, a dedicated family man with exceptionally strong ties to the Orthodox Jewish community in West Hempstead, New York. David has spent considerable time performing charitable work for his community. David, for example, founded a food bank about ten years ago that is used by 30 to 40 families each week. He has regularly volunteered at his synagogue and for the Hebrew Academy of Nassau County. Before his incarceration, David also cared for his elderly father and mother. It is thus no surprise that this Court received 106 detailed letters supporting David for his sentencing hearing.

On November 29, 2017, Your Honor sentenced David to a term of 36-months imprisonment and ordered him to forfeit $309,364.83. A true and correct copy of the sentencing transcript is attached hereto as Exhibit A ("Lubin Sent. Hr'g Tr."). As part of his plea agreement,

David resigned his New York bar license and made an initial payment of $25,000 towards his forfeiture order. (*See* Lubin Sent. Hr'g Tr. at 28:2-16). Since pleading guilty, he was permanently barred from appearing before the SEC as an attorney. *See In the Matter of David Lubin*, S.E.C. Release No. 81172, Administrative Proceeding File No. 3-18070 (July 19, 2017). At his sentencing, Your Honor acknowledged that David was cooperating with the Government and that he would likely be before this Court again with an opportunity to seek a reduced sentence. (Lubin Sent. Hr'g Tr. at 40:5-12).

David began serving his sentence on June 18, 2018. He has been incarcerated for approximately seven months. He has served that time at Bureau of Prisons facilities in Miami, more than 1,300 miles from his wife and family, in New York for reasons explained below.

## ARGUMENT

**I.      David's Cooperation Was Extensive and Substantial**

Counsel for the government is sure to agree that David's cooperation in this case was extensive and substantial. David's testimony helped secure multiple indictments, many guilty pleas, and one conviction by a jury. As the Government said at David's sentencing hearing, David agreed to plead guilty and cooperate in "short order" after the Government laid out the facts and initiated plea discussions. (Lubin Sent. Hr'g Tr. at 18:13; *id*. at 26:7-8 ("[A]fter we approach[ed] Mr. Lubin, he did start the process of cooperation.")). David subsequently participated in multiple proffer sessions with the Government, often traveling at his own expense from New York to Miami to participate in those meetings.

The Government will also agree that David's cooperation was "very important" to securing indictments against two co-conspirators, Yelena Furman and Myron Gushlak. (*See* Lubin Sent. Hr'g Tr. at 25:12-14 ("Mr. Lubin's information was a piece of the information that we used and relied upon to seek [Yelena Furman's and Myron Gushlak's] indictments.")). Furman eventually pled guilty and Gushlak is a fugitive.

Nor can the Government dispute that David's cooperation against John Ahearn, who accepted a guilty plea, was "extremely important." *See United States* v. *Ahearn*, No. 17-cr-20883-KMW (S.D. Fla.).

It is also my understanding from speaking to the Government that David's testimony will help secure charges against another individual who the Government expects to charge in the near future.

David also testified against co-conspirator James Schneider at his criminal trial. *See United States* v. *Schneider*, No. 17-cr-20712-FAM (S.D Fla.). David's testimony, the Government will agree, was "extremely important" in that case. Among other things, David's clear and truthful testimony helped the jury understand certain inscrutable aspects of the securities laws. David's testimony helped tie together the role that each conspirator played in the scheme. In the end, David's testimony helped the Government secure Schneider's conviction on nearly all counts.

David has also cooperated with the Government in two additional investigations. Because these investigations are ongoing, this Memorandum does not describe the investigations in detail.

*First*, David voluntarily assisted the FBI in an obstruction of justice investigation related to David's designation by the BOP to serve his sentence at the Federal Correctional Institution in Otisville, New York. Because David's safety is potentially at risk, we do not describe the nature of the investigation in this Memorandum. We will provide the Court with the relevant facts at the hearing. As a result, and to avoid a potential incident, the BOP ultimately designated David to the FCI in Miami,[1] which has caused David and his family to endure severe hardship, as we explain below.

*Second*, after testifying in the Schneider trial, David agreed to assist another U.S. Attorney's Office's forfeiture investigation. David has agreed to meet with those prosecutors to provide whatever information he may have and he has agreed to accept service of process from them for documents and deposition testimony.

In sum, David has provided (and continues to provide) substantial assistance to the Government in multiple cases. His extensive cooperation merits a substantial reduction of his sentence that is far greater than 40%.

---

[1] The BOP initially indicated that David was going to be re-designated to FCI Fort Dix in New Jersey, about 100 miles from David's home in Long Island. With the counsel of a Rabbi, David learned that the FCI in Miami would likely be more accommodating to David's faith than Fort Dix. Since David would also have to testify in Miami, David asked the BOP to designate him in Miami so he could more easily meet with the Government before trial, even though that decision put him much further away from his family.

**II.     The Gross Sentencing Disparities in this Case Must Be Corrected**

When compared to the other sentences imposed in this case, it is plain that a 40% reduction would not be enough for David. A chart summarizing the pertinent sentences in all of the related cases is attached hereto as Exhibit B (the "Sentencing Chart"). Sentencing David to 22-months imprisonment, or anything close to it, would be fundamentally unfair in light of the other sentences imposed in related cases.

First off, David's sentence should not be higher than the sentences imposed on the scheme's managers/supervisors – Daniel McKelvey, Alvin Mirman, Sheldon Rose, and Steven Sanders – whom the Government referred to as the scheme's "[f]our princip[als]." *United States v. Daniel McKelvey*, No. 16-20546-CR-Scola, Dkt. Entry 54 at 2 (Government's Sentencing Memorandum for Defendant Daniel McKelvey). Daniel McKelvey, Alvin Mirman, Sheldon Rose, and Steven Sanders are hereinafter referred to collectively as the "Four Principals."

Each of the Four Principals "recruited and interacted with outside professionals such as accountants, lawyers, brokers, and specialists" in furtherance of the scheme, according to the Government. *Id.* at 4. The Four Principals "misled certain straw CEOs concerning the true purpose of the companies and engaged in other deceptive conduct." *Id.* According to the Government, "McKelvey added an additional gloss to the fraud by taking blank signatures from various straw CEOs, often under false or misleading pretenses" and then later he "place[d] those signatures onto securities documents to make it appear that the CEOs had executed the documents." *Id.* The Four Principals also "used their spouses, family and friends as straw shareholders." *Id.*

Each of the Four Principals received U.S. Sentencing Guideline ("Guideline[s]") enhancements for acting as a "manager" or "supervisor" of the scheme.

David was neither a manager, supervisor, nor principal. The Government said that David was not the person "pulling the strings, but [was] participating with the people who were." (Lubin Sent. Hr'g Tr. at 27:7-9). In the Government's words, David was merely a "link in the chain . . ." (*Id.* at 23:25).

The Four Principals have already received sentences that are far more lenient than what David would receive if this Court reduced David's sentence by only 40%:

- Daniel McKelvey, who is one year younger than David, was sentenced to only **6 months'** imprisonment – a 90% reduction from his Guideline range of 60 months' imprisonment. *See* Ex. B, Sentencing Chart.

5

- Alvin Mirman faced a 60-month Guideline range that was reduced to 41-51 months after a downward departure. He was sentenced to 12 months' imprisonment, far below the bottom of the Guideline range. But Mirman will not serve even 12 months because his Rule 35 motion has not yet been adjudicated. The Government is asking for a 40% reduction, which if granted, would equate to a **7-month** sentence. *Id.*

- Sheldon Rose faced a 60-month Guideline range. He was initially sentenced to 40 months' imprisonment but a Rule 35 motion reduced his sentence to only **17 months**. *Id.*

- Steven Sanders faced a 60-month Guideline range that was reduced to 41-51 months after a downward departure. He was sentenced to just 16 months. But like Mirman, he will not serve the full term of that sentence because his Rule 35 motion has not yet been adjudicated. The Government is asking for a 40% reduction, which if granted, would equate to a **10-month** sentence. *Id.*

What the sentencing data shows is unmistakably clear and it screams for correction by this Court. The scheme's Four Principals received massive discounts on their initial sentences. Two of the Four Principals stand to benefit even further from pending Rule 35 motions. David, by comparison, received a 36-month sentence from a 46-57 month Guideline range. *Id*. Only Rose's initial sentence was higher. *Id*. At Rose's Rule 35 hearing, the Government asked for 33% off of Rose's 40-month sentence. *Id*. The Court went much higher and granted a 57.5% reduction to impose a 17-month sentence. *Id*. David's sentence should therefore be well below any sentence imposed on the Four Principals as a basic matter of fairness and proportionality in light of David's lesser role in the conspiracy.

The Four Principals also profited substantially more from the scheme than David, as the forfeiture judgments reveal. The Four Principals "netted from $2.2 million to $2.7 million each during the scheme." *United States* v. *Sheldon R. Rose and Ian C. Kass*, No. 16-20706-CR-Martinez, Dkt. Entry 43 at 5 (Government's Sentencing Memorandum for Defendants Sheldon R. Rose and Ian C. Kass) (Rose was ordered to forfeit $2,723,517; Mirman – $2,409,806; Sanders – $2,354,617.09; and McKelvey – $1,560,192). By comparison, David was ordered to

6

forfeit $309,364.83, nearly nine times less than Rose and five times less than McKelvey. David made less from the scheme because his role was much smaller than the Four Principals' roles.[2]

A 22-month sentence, therefore, is unfairly punitive for David who was not a "principal" of the scheme, not a manager/supervisor, was not pulling any of the conspiracy's strings, and made far less from the scheme than the principals.

But it is not just that David's sentence is too severe when compared the Four Principals. Even when compared to the middle of the pack, it is clear that David's reduction should be far greater than what the Government has requested.

Take the sentence imposed on Jeffrey Lamson. Lamson is a 54-year-old accountant who participated in many of the conspiracy's deals. Lamson "acted as a recruiter of straw CEOs, as a straw CEO himself, and opened bank accounts and drafted false accounting documents" in furtherance of the scheme, according to the Government. *Id.* at 6.

Lamson had a Criminal History score of III. Lamson, who was serving a sentence for embezzling $420,000 from his employer at the time of sentencing, was sentenced to only **7 months'** imprisonment to run *concurrently* to his sentence for embezzlement.[3] As a result, Lamson, a serial felon, will do no additional time for his role in the pump and dump scheme. David, by contrast, is a first time offender with substantial ties to his community in Long Island who has already served seven months in prison in unexpectedly harsh conditions.

Next, consider Yelena Furman. She was a stock promoter in the scheme. She "participat[ed] in criminal conduct" with co-conspirator Myron Gushlak "both before he went to prison" for committing securities fraud "and while he was in prison serving time for securities fraud." *United States* v. *Yelena Furman*, No. 17-20713-CR-Altonaga, Dkt. Entry 50 at 6 (Government's Sentencing Memorandum for Defendant Yelena Furman). Nonetheless, the Government said that Furman "did not play a lead role" in the scheme. *Id.* at 4. Furman had a Guideline range of 33-41 months' imprisonment. She was sentenced to only **18 months** and has a Rule 35 motion pending. The Government has asked for a 40% reduction, which would equate to an **11-month** sentence, if granted.

---

[2] David does not want to minimize his crime, but the money David made from the scheme over the course of six years represented a very small percentage of his legal practice, perhaps 10%. David's legal practice was otherwise lawful.

[3] Lamson also has a prior conviction for committing a sex crime.

7

Andrew Wilson was a lawyer who played a similar role to David's in the scheme. Wilson, who will be sentenced sometime this year with the benefit of a Section 5K1.1 motion, is likely facing a Guideline range of 12-18 months. What then, is the likelihood that Wilson will spend less than one year in prison, if he sees prison at all? Seemingly very high.

In light of the other sentences imposed in related cases, a sentence of 22-months' imprisonment – even a year imprisonment – would be unjust. Your Honor made clear at David's sentencing that the Court wanted to assess David's cooperation, assess the other sentences in related cases, and make the appropriate adjustment to David's sentence when the Rule 35 motion was before the Court. David respectfully submits that it would be unfair and unjust if the masterminds of the scheme served less time than he did. It would be unfair and unjust if those who profited millions more from the scheme did less time than he did. It would be unfair and unjust if he was punished more severely than a two-time felon or any other mid-level participant in the scheme.

### III. David, and His Family, Have Disproportionately Suffered Because he was Unjustly Blocked from Serving Time in the Most Appropriate BOP Facility

Put simply, David's time in prison has been harder on him than it would be for most people due to no fault of his own. David was originally designated by the BOP to serve his sentence at Otisville FCI. Otisville is only 100 miles from David's home in West Hempstead, New York. It is a manageable drive for Teri, David's wife of 28 years, and other family members. Otisville also has a substantial Orthodox Jewish community that allows practitioners of that faith, like David, to pray together and otherwise observe their religion. An article published in New York Magazine, explained it this way:

> "Otisville is very close to New York City, so it has more access to a Jewish population, to rabbis, and to kosher food," says Rabbi Menachem Katz, director of prison programs for the Jewish-outreach Aleph Institute. "The Bureau of Prisons kind of unofficially designated it to meet the needs of Orthodox Jews."

Peter Hyman, *Medium-Security Seder*, New York Magazine, Apr. 13, 2008, *available at* http://nymag.com/news/intelligencer/46010/.

David, however, was cruelly denied access to Otisville. About 48 hours before David was scheduled to surrender to begin serving his sentence, he was informed by the BOP that he would be re-designated to a new facility due to concern for David's safety at Otisville. The BOP

8

ultimately designated David to FCI Miami, which is 1,300 miles away from West Hempstead and is far less accommodating to practitioners of his faith compared to Otisville.

The difference in designation has caused David and his family to suffer disproportionately. Teri, for example, has made at least 15 round trips to see David. Other family members have joined in some of those trips. Teri estimates that she has spent nearly $10,000 visiting David, which is a substantial portion of what Teri earns per year as a teacher's assistant (close to 40% of her salary). Teri has also had to use four of her ten vacation days to see David. David's elderly parents have only twice been able to make the journey to Miami. While incarcerated, David became a grandfather; however, he has missed the birth, circumcision, and growth development of his 5-month old grandson. When David can see his family, they are only able to visit David on Sundays because, as observers of the Sabbath, they cannot visit David on Fridays or Saturdays. This obviously substantially curtails the amount of time that David's family can spend with him, which is an additional hardship on David and his family.

It has also been much more difficult for David to practice his faith in the Miami BOP facilities because there are fewer Jewish Orthodox men there. To faithfully recite certain prayers, for example, a congregation known as a "minyan" constituting at least ten adult Jewish men is required. *See, e.g.*, Minyan: The Congregational Quorum, *available at* https://www.myjewishlearning.com/article/minyan-the-congregational-quorum/ (explaining the Biblical origin of the minyan and the 10-person requirement which was derived from the first verse of Psalm 82). A regular "minyan" can be formed at Otisville, but not in Miami. This is just one example of how David's unfortunate designation change has substantially impinged on his religious observance for the last seven months.

David has also been confined at the Miami FDC since November 20, 2018, instead of the low security Camp, because he testified at the Schneider trial. Even though David completed his testimony on November 29th, he has not been returned to the Camp. Multiple entreaties by the Government to the BOP to return David to the Miami Camp have fallen on deaf ears. As a result, David has been held at the FDC unnecessarily for almost two months. Inmates at the FDC cannot go outside. David's ability to practice his religion has been substantially curtailed. He received a refill on his blood pressure medication only last week. Many of the inmates housed at FDC are violent offenders who frequently instigate fights. Lockdowns, which confine David to his small

cell, are common. Highly invasive strip searches are also frequent. These harsh conditions have taken a heavy toll on David, who has lost 30 pounds since his incarceration.

The hardship imposed on David and his family thus provides additional justification for a sentence of "time served" or a sentence of home confinement. Should, however, this Court conclude that David must serve more time in prison, he asks that Your Honor "strongly recommend"[4] that he be designated to serve the remainder of his sentence at the Otisville FCI. We hope the potential safety risks are gone, and we will provide the Court with the relevant facts at the hearing, but only the BOP knows for sure. The Court should take that uncertainty into consideration when deciding on David's sentence, because additional time at the Miami FCI will continue to impose substantial and undue hardship on David and his family.

## CONCLUSION

David's substantial and extensive cooperation, the sentencing disparities created by related cases, and the extreme hardship imposed on David and his family by his incarceration provide ample justification for a sentence of "time served" or a term of home confinement.

Dated:  January 14, 2019                              Respectfully submitted,

/s/ *Jason P. Hernandez*
Jason P. Hernandez
Florida Bar No. 18598
jhernandez@stearnsweaver.com
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130
Telephone:  305.789.3455
Facsimile:  305.789.3395
*Counsel to Defendant David Lubin*

---

[4] If necessary, we ask the Court to make a "strong" recommendations to the BOP that David be designated to Otisville. According to case law, the BOP is more likely to honor a "strong" request from the Court. *See, e.g.*, *United States* v. *Donnelly*, 11-cr-00240-RNC (D. Conn. 2012) (Dkt. Entry 39) ("strongly recommended" that the BOP designate Donnelly to a facility that was closer to his family); *United States* v. *Scoggan*, No. 1:10-CR-24 TS, 2013 WL 5755622, at *1 (D. Utah Oct. 23, 2013) (court "strongly recommended" that defendant participate in the Residential Drug Abuse Program); *United States* v. *Crespo*, No. 00 CR. 357 (SHS), 2007 WL 844739, at *1 (S.D.N.Y. Mar. 19, 2007) ("strong recommendation" that BOP designate state correctional institution); *United States* v. *Taylor*, No. CRIM. 00-29(2)(PAM/E, 2001 WL 1631328, at *4 (D. Minn. July 25, 2001) ("strongly recommends" federal prison camp at Duluth, Minnesota).

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was served by filing via the same via the Court's CM/ECF filing system, and via e-mail on all counsel or parties of record on the Service List below.

                                                    s/ Jason P. Hernandez
                                                    *Counsel to Defendant David Lubin*

## SERVICE LIST

Jerrob Duffy, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of Florida
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9273
Fax: (305) 530-6168
Email: Jerrob.Duffy@usdoj.gov
*Counsel for the United States of America*